TINER et al. v. TOWLE PLACE
DEVELOPMENT CO.

No. 3002.

Court of Civil Appeals of Texas.
Eastland.

May 15, 1953.

Charles O. Shields, Dallas, for appellant.

William A. McKenzie of Wynne & Wynne, Dallas, for appellee.

COLLINGS, Justice.

This suit was brought by R. H. Tiner, Sr., and R. H. Tiner, Jr., doing business as Safeway Plumbing Company, against Towle Place Development Company, a corporation, upon an alleged implied contract or in the alternative, in quantum meruit for the sum of $6,636.54 alleged to be the value of extra work and materials furnished by plaintiffs during the performance of a plumbing contract entered into between the parties on August 14, 1950. Recovery was also sought for $1,839.08 alleged to be due under the terms of the contract but such amount was tendered and paid by the de-

4. May 31, 1941.

velopment company in open court and is not here in controversy. Trial was before the court without a jury and judgment rendered for defendant development Company, denying plaintiffs recovery on their claim. Plaintiffs have brought this appeal.

The basis of appellant's claim for extra work and material was a provision in the contract that water and sewer connections should be made "in parkway". It was necessary in most instances to connect water, sewer and gas mains in the alleys at the back of the lots. Appellants urge that by reason of the change in location of the utility mains from the "parkway" in front of the lots to the back of the lots, extra work not contemplated or included in the contract was required to be done. The evidence shows that the parties entered into the contract on August 14, 1950, whereby appellants agreed to do the plumbing on 100 houses in Towle Place Addition to the City of Snyder. By the terms of the contract, appellants were to receive $593.38 for installation of each unit with sink and bath fixtures back-to-back and $627.21 for each unit with sink and bath separate. It was provided in the contract that the plumbing contractor should perform the details of the work contemplated in accordance with plans, specifications and instructions set forth therein and furnish and install designated items and material for each unit. Listed among the items were the following:

"7. Run and connect water to meter in parkway.

\* \* \* \* \* \*

"9. Connect to sewer lateral in parkway."

There was no written provision in the contract as to where connections should be made to gas mains.

The following findings of fact and conclusions of law, among others, were made and filed by the court:

"Findings of Fact

"1. The Court finds that plaintiff and defendant entered into the contract providing for the installation of plumbing fixtures and the making of connections with water, gas and sewer lines as appears from Plaintiff's Exhibit No. 1 in the Statement of Facts.

"2. I find that plans and specifications for the proposed development of Towle Place were furnished to plaintiff by defendant and at all times during the construction work under the contract the plans and specifications for the plumbing and facilities to be installed were available to plaintiff.

\* \* \* \* \* \*

"6. I further find that plaintiff undertook to support his allegations as to the amount of extra work done by showing an average of additional distances, that he was required to go in making the connections in the alleys instead of in the parkways, and did not attempt to show the exact number of feet additional required on each house in which plaintiff installed the plumbing and made the connections.

"Conclusions of Law

"4. The Court further finds as a matter of law that the evidence is too indefinite and uncertain to authorize recovery for the extra work claimed."

It is urged by appellants that the court erred in holding the evidence too indefinite and uncertain to authorize recovery for the extra charge claimed. We have endeavored to make a careful examination of the record and have reached the conclusion that the point must be overruled. The evidence is conflicting as to what plans and specifications were available to appellants at the time of the execution of the contract and were referred to by the contract. The plans which appellants contend to be the ones referred to and to which they had access did not show the location of the houses on the lots, and, therefore, did not show the amount of utility lines that appellants would be required to supply. Such plans did not indicate the proposed location of the utility mains unless a dotted line about 7½ feet from the back of the lots was intended for that purpose. No one testified that the line was so intended, but it was referred to by some witnesses as the utility easement. Assuming, without deciding, that a consideration of the terms of contract, together with the plans and specifications, obligated ap-

pellants to connect the plumbing with mains located in the "parkways" except for the gas mains concerning which the contract made no provision, and that the installation of any more feet of utility lines than was necessary to run such water and sewer lines from the houses to the "parkway" was extra work, for which appellants were entitled to additional compensation, there is still uncertainty as to how much compensation, if any, appellants would be entitled. If appellants are to recover for extra labor and material, it is incumbent on them to show that extra labor and materials were actually furnished. The evidence shows that the lots were of different lengths and appellants admit that in some instances, there was a saving of labor and material by connecting with utility lines in the back instead of in the front of the lots. Appellants did not attempt to show the exact number of additional feet or amount of extra labor required on each house upon which they claimed additional compensation but undertook to establish the extra charge on the basis of the average cost per foot for laying utility lines computed from seven of the first twenty houses, and as best we can understand, estimated the extra distances likewise by average and comparison. Appellants estimated that the average amount of utility lines per house that they would have been required to install by connecting with mains in the "parkways" would have been 50 feet. The evidence shows that this estimate was arrived at by adding 35 feet, the estimated distance from the front of the house to the front of the lot, to 15 feet, the estimated average distance from the front of the house back to the "stack" where the utility lines were attached. The house plans are not in evidence but it is indicated that they varied in depth. There was also evidence to justify the conclusion that if utility lines were started from the back of the house that in many instances it would be substantially further to the front of the lot than to the back of the lot. The evidence, in our opinion, is also indefinite and not conclusive on the question of whether appellants were required to run utility lines only to the front property line or a few feet more out into the "parkway" where the mains were located in the parkway, and whether appellants were required to lay such lines the entire distance to the back property line or only to the utility easement line which was 7½ feet nearer. The only evidence as to where the "stacks" were located was by appellant Tiner, who is an interested witness. He testified that the "stacks" were an average distance of about 15 feet from the front of the house, but this is simply an estimate and not supported by any figures showing how the result was reached. It amounts to no more than an opinion which the court was free to give such weight as it thought proper. Simmonds v. St. Louis, B. & M. Ry. Co., Com., 127 Tex. 23, 91 S.W.2d 332. There was testimony concerning extra distances or work on only a few specific lots. An example of such testimony is the following by appellant Robert H. Tiner, Jr., in which the extra charge and its application to specific lots is sought to be explained:

"Q. Now, let's go on back to E. How did you figure E? A. Well, I took the distance, the depth of the lot and * * * let's see * * * I don't remember offhand. Well, we will say Lot 5, Block E, the long side is 124.76 and the short side is 114.17. Now, the way it figured out was 35 feet from the property line plus the other pipe which I had figured which totaled a hundred feet which was deducted from the total amount of each lot, and that left 14 feet of extra distance I had to put in the back.

"Q. Well, Mr. Tiner, your house, even taking your figures, it was 35 feet from the property line, wasn't it? A. Yes.

"Q. How deep was the house? A. They vary.

"Q. Well, I ask you how deep was this one? A. I don't * * *

"Q. You don't know how deep it is, do you? A. No, I don't. I take from the central location of the stack.

"Q. Some of the houses are longer. You are charging for what you claim you did but if you don't know how long the house is how do you know what extra work you did? A. I don't remember the length of each house.

"Q. Well, how did you make up your account? Did you guess at it? A. No, I measured them.

"Q. Did you measure that house? A. Not that one, no.

"Q. Well, I am asking you about that one then we will go into another one in a minute. Now, you are charging us that you did extra work and I want you to tell me how you figured the extra work on that house, Lot 5? A. The extra work on Lot 5 was figured from the total depth of the lot less 100 feet, which I had arrived at on the first twenty houses. In all those houses there was * * *

"Q. You don't know how much work you did on this particular lot, then, at all? A. No, sir, not that particular lot. I took the first twenty houses and took the time that was spent on those houses and arrived at the total labor per foot on each one of those houses, the average, to keep from having to keep records on all of them, because I would have had to spend more time on it.

"Q. Well, but you are claiming that you did extra work on this particular lot and I am trying to see how you arrived at it. A. My record shows I did, yes, the water and gas lines * *

"Q. Well, how much extra footage? A. Fourteen feet.

"Q. How many hours on that? A. Well, I can give you what they average out.

"Q. I don't want average; I want to know what you did on this lot. You say that you did this extra work. A. I had fourteen foot of water and fourteen foot of gas.

"Q. Now, isn't it true that it is closer to the utilities in this house on Lot 5 than it would be if you had put it in at the front by four feet? A. That should be the case.

"Q. Well, and yet you charge us for work done on 25 feet. A. Well, I told you if there was any discrepancy in the bid * * *

"Q. All right, now take Lot No. 6. You charge us for how much there? A. 25 feet.

"Q. All right. Now, I will ask you if it isn't a fact that there is a difference of 11 feet shorter going to the back than it is going to the front? A. That I don't know. You are saying it. I don't know that.

"Q. No, I am asking you. You are the man that is swearing the account is correct, and I want to know it. That is all I am after; I am not testifying. A. I go by the lot and the set-back of the houses.

"Q. All right, let's go to No. 7. What did you charge us on No. 7? A. The same amount, 25 feet.

"Q. Now, I will ask you if it isn't a fact if you go to the back it is 60 feet and if you go to the front it is 68 feet, leaving a margin of distance of 8 feet? A. That is incorrect.

"Q. All right. Show how it is incorrect. I am asking you. A. Well, the house is setting * * *

"Q. The house is what, sir? A. The house is setting 35 feet from the property line and none of the houses are over 30 or 40 feet deep.

"Q. How deep is this house? A. It is not over 40.

"Q. How deep is the house? A. I say it is not over 40 feet.

"Q. All right, say the house is 40 and it is 35, that is 75 feet to the front, and how far across the back is it?

* * * * * *

"Q. All right, 75 feet, that's your own contention, how deep is the lot? A. 125 feet.

"Q. All right, take 75 off 125 and that's 50 feet, isn't it? A. That's right.

"Q. Then it is shorter to go to the back than it is to go to the front, isn't it? A. No, it isn't.

"Q. Why wouldn't it be? You have got 35 feet in front and the house is 40 feet, that's 75? A. I didn't say the house was 40.

"Q. Well, I asked you what it is. If it is not 40 you say what it is. A. Just a minute. It is not over 30 feet deep.

"Q. All right, then 30; 30 and 35 is 65? A. Yes, sir.

"Q. And to the back it is 60, isn't it? Here is 35 and you say the house is 30; that is 65, isn't it, you say to go to the back of the house? All right, that is 30 and 35, and the lot is 125, take 65 off and you have got 60 feet, making it five feet less to go to the back than it does to go to the front, doesn't it? A. If those figures are correct.

"Q. Well, you say it's 125? A. Yes, the depth of the lot is.

"Q. All right, you say the house is 35 feet? A. I said the house was not over 30. I didn't say it.

"Q. All right, you said it was 35 feet from where you figured it from the property line. Now, taking your own figures, 35 feet from the line back, taking the 30 feet which you say is the length of the house, that's 65 feet by your own figures, isn't it? A. I did not figure from the back of the house. I figured from the center * * * from the base of the stack.

"Q. Didn't you just tell the court a while ago and make a dot at the back of the house to show him where you put it? A. I said I figured it from the base of the stack, which I say the vicinity of the bathroom is, at the back of the house.

"Q. Then, if that is correct, you are minus there, aren't you, and you are charging us with 25 feet, isn't that right? A. I charge you with 25 because * * *

"Q. All right, now go to the next one. A. Well, let's get this one straight first.

"Q. Well, I think it is straight.

"The Court: Let him finish his answer.

"Mr. Wynn: All right.

"Q. (By Mr. Wynn) Go ahead. A. Well, the base of that stack is approximately fifteen * * * from the stack, the outside * * * from the stack to the front of that house is between fifteen and twenty feet.

"Q. Well, now, Mr. Tiner, you are suing us, claiming you did certain work on measurements. I don't want a question between 15 and 20 feet. How many did you do? Now, you say 25 feet; how did you get the 25 feet? A. Well, I figured I had to run from the house * * *

"Q. No, I want to figure what you did run, Mr. Tiner, not what you had to run. A. Well, you asked me how I arrived at the figure. I am trying to tell you.

"Q. All right. A. We take the plans, the first ones I saw, and measured on the job from the base of the stack up to the front of the house, which was so many feet, and then from the front of the house to the property line.

"Q. All right, how far was the stack on this one that you say was 25 feet? A. Those houses were on an average basis and it was the average cost. There were five different type houses, five different floor plans. Each one of those was figured separately.

"Q. I am asking you about this particular one. How far was it? Where was it? How did you arrive at the 25 feet? A. Well, just a minute, and I will explain it to you. That figure from the base of the stack to the property line is 60 feet. It averages out on every one of those jobs. Some of them are a little more and some of them are a little less.

"Q. Well, now * * * A. I would say that house is 50 feet from the base of the stack to the property line, and you swing that 50 feet around from the base of that stack and you are sticking 50 feet out, and if this is a hundred feet that leaves 25 feet to the line.

"Q. You say you got that distance from what? A. I measured the first twenty houses.

"Q. From the plans that were furnished you, you say you got that? A. from the first twenty houses.

"Q. Sir? A. From the actual first twenty houses.

"Q. Well, but you got the distance you bid on, a while ago you said, from figuring the stack from the plans that were furnished you? A. At the time the plat I had didn't have the plan number that was going on each lot and there was no way of me telling what house was going on each plan, so I gave them prices on two different plans, one that was back to the back and one that wasn't * * * one where the kitchen was backed up to the bathroom and the other one was where it was fifteen or twenty feet away."

The standard of comparison or the basis of the average used and relied upon by appellants and its application to specific lots is not of such a clear and definite nature as to be conclusive that they did furnish extra material and labor or if so, how much. The standard or average relied upon by appellants is also based on an estimate made by an interested witness and is, therefore, not binding and conclusive.

Judgment was entered against appellants and the court has found the evidence to be too indefinite and uncertain to authorize recovery for the extra charge claimed. To disturb this judgment it must appear that the evidence is conclusive that appellants did furnish extra labor and material. We do not so find. Other points presented by appellants become immaterial in view of this finding and need not be discussed.

For the reasons stated, the judgment of the trial court is affirmed.